# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES**, <br><br> v. <br><br> **RAMON ABASS**, <br><br> Defendant. | No. 25-cr-79 |

## MEMORANDUM OPINION

A grand jury indicted Defendant Ramon Abass on one count of being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g). ECF No. 1. Abass now moves to suppress the firearm and pills recovered when police stopped and subsequently arrested him on March 14, 2025. ECF No. 24. Although it is a close case, the court finds that police had reasonable suspicion to justify the initial stop which then ripened into probable cause for arrest. Abass's Motion to Suppress is therefore DENIED.

## I.    BACKGROUND

The court held two evidentiary hearings on the instant Motion on October 3 and October 6, 2025. *See* Min. Entry (Oct. 3, 2025); Min. Entry (Oct. 6, 2025). At those hearings, the court heard testimony from Officer Daniel Reid, a five-year veteran of the Metropolitan Police Department ("MPD") who assisted with Defendant's arrest on March 14, 2025. *See* Oct. 3 Hr'g Tr. (Rough Draft) at 16, 18–19 ("Oct. 3 Tr."). On that day, Officer Reid was patrolling the Trinidad neighborhood of Washington as a uniformed member of the Fifth District Crime Suppression Team. *Id.* at 17; *see also* Oct. 6 Hr'g Tr. at 43, ECF No. 30 ("Oct. 6 Tr."). Reid was the only MPD officer who testified, but he authenticated the body-worn camera footage of

Officers Mangold Vanreil and Daniel Greenberg, as well as his own. *See* Gov't Ex. 301 (Reid

Footage); Gov't Ex. 302 (Vanreil Footage); Gov't Ex. 303 (Greenberg Footage). The court finds

Officer Reid's testimony credible except where otherwise noted. *See* Oct. 6 Tr. at 48, 51–52,

58–59 (explaining this credibility determination). His testimony and the other evidence

established the following:

On March 14, 2025, at around 6 p.m., two marked police cruisers drove south on Orren

Street NE carrying Officer Reid and other uniformed members of the Fifth District Crime

Suppression Team. Oct. 3 Tr. at 34, 36. Officers Reid, Vanreil, and Greenberg were in the lead

cruiser. *Id.* at 39, 42. As the two cruisers traveled down the 1300 block of Orren, none of the

officers observed any firearms in the street. *See id.* at 36–38; *see also* Gov't Exhibit 301 at

17:58:14–38. When the officers reached the intersection of Orren and Neal, they saw a silver

sedan parked to their left on the 1300 block of Neal. Oct. 3 Tr. at 41. A gray sedan was parked

across the street from the silver sedan. *Id.*

As the lead MPD cruiser approached the intersection and began turning onto the 1300

block of Neal, the silver sedan began to drive off and eventually turned right onto the 1300 block

of Orren. Gov't Ex. 401 at 6:00:40–57 (MPD Camera Footage); *see also* Oct. 3 Tr. at 41.

Before the MPD vehicle finished its left turn onto Neal, the Defendant partially opened the gray

sedan's rear driver-side door and then began to close it. Gov't Ex. 401 at 6:00:57–6:01:01.

Camera footage shows the Defendant looking at the lead MPD cruiser as it approached. *Id.*; *see

also* Oct. 6 Tr. at 41–42.

Once the cruiser came to a complete stop next to the gray sedan but before any officers

made contact with the sedan's occupants, the Defendant opened the door and ran from the car,

leaving the door open behind him. *See* Gov't Ex. 401 at 6:01:01–03; *see also* Oct. 3 Tr. at 42.

The officers exited their cruisers and began chasing the Defendant on foot as he ran north on the 1300 block of Orren towards the silver sedan, which had stopped roughly halfway down the block. *See* Gov't Ex. 402 at 6:01:04–12 (MPD Camera Footage). The Defendant lost his hat while fleeing, *id.*, but continued to make "a beeline" to the silver sedan. Oct. 6 Tr. at 27. Officer Vanreil led the chase, and Officer Reid trailed a few steps behind him. Oct. 3 Tr. at 48, 57.

During the chase, Officer Reid observed the Defendant keep his left elbow braced against his body and bent at a 45-degree angle, with his left hand in front of his body. Oct. 3 Tr. at 48, 55; *see also* Oct. 6 Tr. at 35, 38. Officer Reid testified that based on his training and experience, suspects who flee with an elbow bent at a 45-degree angle are "typically . . . securing an object that's in the front of their waistband" and that police "usually recover a firearm" upon apprehending those individuals. Oct. 6 Tr. at 35. But Officer Reid was behind the Defendant during the foot chase and conceded that he was not able to tell whether the Defendant was in fact holding onto an object. Oct. 6 Tr. at 32. Thus, although Officer Reid believed that the Defendant's arm position was consistent with him securing a firearm in his waistband, Officer Reid did not observe the Defendant securing an object or holding onto a bulge at any point.[1] *See also* Oct. 6 Tr. at 31 (Q: "You never saw him do any sort of security check, right?" A: "Not a

---

[1] During direct examination on October 3, Reid testified that the Defendant's left arm was positioned "as if he were securing an object" in the front of his body, but Reid did not testify that he saw the Defendant securing any object or holding onto a bulge. Oct. 3 Tr. at 48. During redirect examination on October 6, after having his recollection refreshed by his *Gerstein* affidavit, Reid testified that he had previously stated in his Gerstein affidavit that he "saw the Defendant was trying to attempt to secure a heavy object." Oct. 6 Tr. at 38–39. Although the court credits Officer Reid's testimony that he could see the Defendant's left elbow braced at a 45-degree angle and his left hand at the front of his body, the court does not believe Reid saw or could have seen Defendant securing an object in his waistband, and Reid conceded as much. *See* Oct. 6 Tr. at 32.

security check.  I didn't see him do that.").  Officer Reid also testified that it was possible that Abass was bracing his elbow to hold his pants up while running.  Oct. 6 Tr. at 12.

After making it approximately halfway down the 1300 block of Orren, the Defendant reached the silver sedan and managed to open its front passenger-side door, attempting to get inside.  Oct. 3 Tr. at 49; *see also* Gov't Ex. 302 at 17:58:58–17:59:02.  But before he could do so, Officer Vanreil grabbed him and tried to pull him away from the car.  Gov't Ex. 302 at 17:58:58–17:59:02.  Vanreil reported hearing "a metallic sound" during this struggle.  Oct. 3 Tr. at 51.  Officer Reid did not recall hearing the metallic sound and did not see a gun fall from the Defendant's person.  Oct. 6 Tr. at 6.  Shortly thereafter, Officer Greenberg alerted to the presence of a firearm in the street, close to where Officer Vanreil had grabbed the Defendant just seconds before.  Oct. 3 Tr. at 51–53; *see also* Ex. 303 at 17:59:00–09.

Around the same time that Officer Vanreil grabbed the Defendant, the silver sedan began to accelerate, causing Officer Vanreil and the Defendant to fall to the ground.  *See* Gov't Ex. 302 at 17:58:58–17:59:02.  The Defendant continued to cling to the outside of the car for approximately five to ten seconds as it drove off, dragging the Defendant for roughly a half block before he let go.  Oct. 3 Tr. at 49–50, 53.  The Defendant then stumbled onto the sidewalk, where he was arrested and searched.  Oct. 3 Tr. at 54; *see also* Gov't Ex. 301 at 17:59:05–16.  During the search, officers recovered what appeared to be 32 Oxycodone Hydrochlorine and 4.5 Alprazolam pills from the Defendant's right jacket pocket.  Oct. 6 Tr. at 43; *see also* Gov't's Pretrial Detention Mem. at 5–6, ECF No. 6.

## II.    LEGAL STANDARDS

The Fourth Amendment provides that the "right of the people to be secure in their persons . . . against unreasonable searches and seizures shall not be violated."  U.S. Const.

amend. IV.  "Consistent with the Fourth Amendment," an officer may "conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (cleaned up).  The Defendant bears the burden of establishing that he was stopped. *United States v. Castle*, 825 F.3d 625, 633 (D.C. Cir. 2016).  The burden then shifts to the Government to provide reasonable suspicion sufficient to justify the stop. *Id.* at 634.

## III.    DISCUSSION

### A.  Moment of the Initial Stop

"A Fourth Amendment seizure occurs when physical force is used to restrain movement or when a person submits to an officer's show of authority." *United States v. Gamble*, 77 F.4th 1041, 1044 (D.C. 2023) (quoting *United States v. Delaney*, 955 F.3d 1077, 1081 (D.C. Cir. 2020)).  Thus, if police order a suspect to stop and the suspect flees before any force is applied, "[t]hat is no seizure"—the suspect has not submitted to the officers' show of authority. *California v. Hodari D.*, 499 U.S. 621, 626 (1991).  In such circumstances, the fleeing suspect is "not seized until" police stop him, or he stops and submits himself. *Id.*  Applying those principles here, the Defendant was not stopped until Officer Vanriel grabbed him following a chase.  The defense does not argue to the contrary. *See* Def.'s Suppl. Br. at 3, ECF No. 29.

### B.  Reasonable Suspicion

"With the timing of the seizure established," the court "turn[s] next to whether, at that point, the officers possessed 'specific and articulable facts' to 'support a reasonable and articulable suspicion that [the Defendant] was engaged in criminal activity.'" *Delaney*, 955 F.3d at 1085 (quoting *Castle*, 825 F.3d at 634).  In evaluating whether there is reasonable suspicion, the court looks to all "facts available to the officer at the moment of seizure"—and only those

facts. *Castle*, 825 F.3d at 635 (quoting *Terry v. Ohio*, 392 U.S. 1, 21–22 (1968)). Although reasonable suspicion is "a standard significantly lower than . . . probable cause" and "require[s] only that officers have a 'minimal level of objective justification,'" *United States v. Goddard*, 491 F.3d 457, 460 (D.C. Cir. 2007) (quoting *INS v. Delgado*, 466 U.S. 210, 217 (1984)), "a mere hunch" is insufficient. *Kansas v. Glover*, 589 U.S. 376, 380 (2020) (quoting *Prado Navarette v. California*, 572 U.S. 393, 397 (2014)). In conducting this analysis, the court must "consider the whole picture" and avoid an "excessively technical dissection" of "each fact in isolation." *District of Columbia v. Wesby*, 583 U.S. 48, 60 (2018) (cleaned up); *see also Delaney*, 955 F.3d at 1087. Facts that are "individually susceptible to an innocent explanation" may become less innocent "when taken together." *Castle*, 825 F.3d at 635 (cleaned up).

The Government points to four factors to establish reasonable suspicion: (1) the Defendant's presence in a high-crime neighborhood; (2) the Defendant's unprovoked, headlong flight upon seeing police; (3) the manner in which the Defendant braced his left arm as he ran; and (4) the Defendant's attempt to get into the fleeing silver sedan. *See* Gov't's Opp'n at 10, ECF No. 25. Although the Government has failed to establish that the area surrounding the Orren-Neal intersection is a "high-crime" neighborhood, the three other factors, taken together, narrowly suffice to establish reasonable suspicion.

a. High-Crime Area

"The high-crime nature of the neighborhood" where a defendant is stopped is a relevant "contextual consideration" that can "corroborate" but "not provide" reasonable suspicion. *Castle*, 825 F.3d at 636 (cleaned up). In other words, "the fact that a given locale is well known for criminal activity will not *by itself* justify a *Terry* stop; but it is among the various factors that officers may take into account." *United States v. Edmonds*, 240 F.3d 55, 60 (D.C. Cir. 2001)

(emphasis in original). This consideration is strongest, moreover, when the area "is home to the precise type of infractions" that officers "suspect[] [the defendant] of committing." *Id.* at 60.

In cases where the D.C. Circuit has relied on the high-crime nature of an area to support reasonable suspicion, the Government had identified the area with considerable precision. *See Edmonds*, 240 F.3d at 60 (explaining that the government "submitted evidence . . . that the 4600 block of Livingston Road suffers from a high incidence of crime" and was an "open air drug market"); *United States v. Douglas*, 72 F.4th 332, 335 (D.C. Cir. 2023) (Randolph, J., concurring in the judgment) ("[T]he location of the stop was not only in a general high crime area, but in a specific location – the walkway in the 2300 block of 15th Street – known for criminal transactions."); *see also United States v. Jones*, 1 F.4th 50, 53 (D.C. Cir. 2021) ("[D]efendant's presence in the precisely identified area where a crime has recently occurred" supported reasonable suspicion.) (citing *United States v. Brown*, 334 F.3d 1161, 1165–68 (D.C. Cir. 2003))).

Here, the Government did not show that the Orren-Neal intersection constitutes a high-crime area. Although Officer Reid testified that his unit is in that area two to three times a week "due to typical high crime," Oct. 3 Tr. at 20, the data does not support his use of the high-crime label. *See United States v. Freeman*, 735 F.3d 92, 101 (2d Cir. 2013) ("[T]he general label 'high crime area' is not a substitute for analysis of the underlying testimony."); *see also United States v. Jones*, --- F. Supp. 3d ---, 2024 WL 2269428, at *2 (D.D.C. 2024) (discounting officer's "impression" that a neighborhood was high crime when that impression was not based on "statistics or facts contextualizing the area within D.C. as a whole"). The Government submitted only four police reports of gun crime within two blocks of the Orren-Neal intersection from the four months before Abass's arrest. *See* Gov't Exs. 101, 102, 108, 109. The Government's five

other police reports from the same period documented incidents as far as "seven to nine blocks" and "half a mile" away, *see* Oct. 3 Tr. at 28–29, with most of these other incidents occurring in denser commercial and nightlife areas that are different from the residential Orren-Neal intersection. *See* Gov't Exs. 103, 104, 105, 106, 107; *see also* Oct. 3 Tr. at 63, 69–73.

Officer Reid, moreover, testified that most of the houses surrounding the Orren-Neal intersection are "good" and recently refurbished. Oct. 3 Tr. at 78. Reid could not recall making any drug arrests before March 14 on the block where Abass was arrested, nor could he recall any gun crimes on that block within the previous week. Oct. 3 Tr. at 62, 67, 82.[2] And nothing specific led officers to the Orren-Neal intersection that day. Oct. 3 Tr. at 36 ("Q: Anything specific on that day that led you to go there?" A: "No. Nothing specific."). In short, the Government has not shown that the precise area where Abass was arrested suffers from high crime.

Instead, the Government largely contends that the general area—a 500-meter radius around the Orren-Neal intersection—suffers from a high incidence of gun crime. *See* Gov't Opp'n at 13–14. Even if the high-crime nature of an area so broadly defined could support reasonable suspicion, the Government has failed to carry its burden on this record. To start, an officer's assertion that a neighborhood suffers from high crime does not make it so. *See* *Freeman*, 735 F.3d at 101 ("[T]he general label 'high crime area' is not a substitute for analysis of the underlying testimony."). MPD's own data indicates that the incidence of gun crime in the Police Service Area where Abass was arrested was only slightly above average for the District of

---

[2] Officer Reid participated in one controlled drug buy in the area after Abass's arrest on March 14. But that is irrelevant to this analysis because "an otherwise unreasonable seizure of course cannot be transformed into a reasonable one by virtue of information that comes to light only after the seizure." *Gamble*, 77 F.4th at 1046. In any event, a single controlled buy does not a high-crime area make.

Columbia.  *See* Oct. 3 Tr. at 80–81.  Consistent with that data, the Government provided only nine police reports indicating gun violence over a four-month period within a 500-meter radius in a dense city neighborhood.  That averages out to slightly more than two reports a month.  On this record, the Government has failed to show that even the general area around the Orren-Neal intersection suffers from high crime.

             b.  <u>Unprovoked, Headlong Flight</u>

The Government has established, however, that Abass engaged in unprovoked and almost immediate flight upon noticing police.[3]  For the reasons below, this factor partially but not fully supports reasonable suspicion.  *See United States v. Brown*, 925 F.3d 1150, 1155 (9th Cir. 2019) (explaining why unprovoked flight from police receives "significant" but not dispositive weight in the reasonable suspicion analysis).

On one hand, "it is well settled that an individual's furtive movements" in response to police presence "may be grounds for reasonable suspicion and fear, justifying a *Terry* stop and search."  *United States v. Washington*, 559 F.3d 573, 577 (D.C. Cir. 2009) (cleaned up).  "Headlong flight—wherever it occurs—is the consummate act of evasion" and is therefore "certainly suggestive" of criminal activity.  *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000).

On the other hand, "flight is not necessarily indicative" of wrongdoing.  *Wardlow*, 528 U.S. at 125.  There are many reasons "that innocent people may . . . flee from the police."  *Brown*, 925 F.3d at 1155; *see also Alberty v. United States*, 162 U.S. 499, 511 (1896) ("It is a matter of common knowledge that men who are entirely innocent do sometimes fly from the

---

[3]  As recounted above, unrebutted evidence shows that Abass looked directly at the marked police cruiser as it turned onto Neal and then darted out of the gray sedan, leaving the car door open behind him.  *See* Gov't Ex. 401 at 6:00:57–6:01:03.  The officers had not made contact with the occupants of the gray sedan nor used their sirens before Abass took flight.  *See* Oct. 3 Tr. at 42; *see also* Gov't Ex. 401 at 6:00:57–6:01:03.

scene of a crime . . . .").  They may have "a natural fear or dislike of authority, a distaste for police officers based upon past experience," or a "fear of police brutality or harassment."  *Miles v. United States*, 181 A.3d 633, 641 (D.C. 2018) (cleaned up).  Or they may seek to avoid the "serious intrusion upon the sanctity of the person" and "great indignity" that a *Terry* stop and frisk inflicts.  *Terry*, 392 U.S. at 17.  And notably, a person has "no obligation to stop and speak to an officer" unless and until she is detained.  *See Brown*, 925 F.3d at 1155 (citing *Florida v. Royer*, 460 U.S. 491, 497–98 (1983)).

Accordingly, "flight alone is not enough to justify a police stop."  *United States v. Bonner*, 363 F.3d 213, 215 (3d Cir. 2004).  To establish reasonable suspicion, the Government must point to something more—"some other indicia of wrongdoing."  *Id.* at 217; *cf. United States v. Green*, 670 F.2d 1148, 1152 (D.C. Cir. 1981) ("[F]light is not a reliable indicator of guilt without other circumstances to make its import less ambiguous." (quoting *Hinton v. United States*, 424 F.2d 876, 879 (D.C. Cir. 1969))).  In *Illinois v. Wardlow*, "the 'plus' factor was Wardlow's mere presence in an area known for high narcotics trafficking."  *Bonner*, 363 F.3d at 217 (citing *Wardlow*, 528 U.S. at 124).  Although the Government has failed to establish that plus factor here, it points to two other factors that—taken together—narrowly clear the bar.

c.  Defendant's Left-Arm Position

Although Officer Reid did not and indeed could not see whether the Defendant was holding onto an object in his waistband as he fled, Reid inferred from the Defendant's unnatural left-arm position that he may have been securing a firearm.  "Law enforcement officers naturally reach conclusions based on their training and experience," and "the court's role is to decide whether the officer's inference from the facts was 'reasonable.'"  *United States v. Prandy-Binett*, 995 F.2d 1069, 1071 (D.C. Cir. 1993) (quoting *United States v. Ortiz*, 422 U.S. 891, 897 (1975)).

Reid testified that over the course of his five-year career as an MPD officer, he has made approximately 20 to 30 gun-related arrests, assisted in approximately 90 more, and received training on the mannerisms typical among armed individuals.  Oct. 3 Tr. at 31, 33–34.  Officer Reid testified that based on his training and experience, individuals who flee with one elbow braced at a 45-degree angle are "typically . . . securing an object that's in the front of their waistband" and that officers "usually recover a firearm" when those individuals are arrested. Oct. 6 Tr. at 35.

Given the unusual way the Defendant braced his arm as he ran, which stands in contrast to the ordinary way the officers were running, *see* Gov't Ex. 402 at 6:01:03–12, the court credits the inference drawn by Officer Reid, which provides some support for reasonable suspicion.[4] *See United States v. Bullock*, 510 F.3d 342, 348 (D.C. Cir. 2007) (defendant's "furtive gestures with his hands by repeatedly moving his hands towards his lap area" contributed to reasonable suspicion); *United States v. Gross*, 784 F.3d 784, 786, 788 (D.C. Cir. 2015) (District court's finding of reasonable suspicion for a frisk not challenged on appeal where defendant fled upon

---

[4]  The defense contends that Officer Reid's observation is irrelevant because Officer Vanreil made the stop and "the record does not indicate" that Vanreil "ever saw" "the 45-degree left-arm angle."  Def.'s Suppl. Br. at 6, ECF No. 28 (cleaned up).  But Officer Vanreil's body-worn camera footage indicates that the Defendant's left-arm position would have been visible to Officer Vanreil as well.  *See* Gov't Ex. 302 at 17:58:55–58.  The footage of the chase captured by the MPD's street surveillance camera likewise indicates this.  *See* Gov't Ex. 402 at 6:01:05–09.  Indeed, Officer Vanreil was closer in pursuit and had a better view.  *Compare* Gov't Ex. 302 *with* Gov't Ex. 301.  Moreover, the court credits Officer Reid's reasonable inference regarding the meaning of the left-arm position because the reasonable suspicion analysis is objective.  The court asks "whether [the] historical facts, *viewed from the standpoint of an objectively reasonable officer*, amount to reasonable suspicion," regardless of the arresting officer's "subjective reactions" to the historical facts.  *See Brown*, 334 F.3d at 1164, 1168 (emphasis added) (cleaned up); *see also Whren v. United States*, 517 U.S. 806, 813 (1996) ("The fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action." (cleaned up)).

police questioning, "patt[ed] his right side with his hand as he ran, behavior that [officer] testified 'can mean someone is trying to hold a gun in their waistband,'" and where officer "also smelled PCP while pursuing" defendant); *United States v. Gorham*, 317 F. Supp. 3d 459, 468 (D.D.C. 2018) (defendant's "touching his waistband or side while in flight" contributed to reasonable suspicion for a frisk); *United States v. Lovelace*, 357 F. Supp. 2d 39, 44 (D.D.C. 2004) (defendant's "reaching motions towards his waistband" supported reasonable suspicion).

But the weight to which Officer Reid's inference is entitled is substantially diminished by the fact that he never saw the Defendant securing a heavy bulge or even an object in his waistband; he merely observed behavior that was consistent with that possibility. As the defense stresses, other plausible possibilities abound: The Defendant could have been clutching a cellphone or attempting to hold up baggy pants. *See* Oct. 6 Tr. at 12.[5]  While it is of course true that officers "need not *rule out* the possibility of innocent conduct," *United States v. Arvizu*, 534 U.S. 266, 277 (2002) (emphasis added), that is not a license to ignore competing facts that fairly detract from reasonable suspicion. *See Kansas v. Glover*, 589 U.S. 376, 386 (2020).  The totality-of-the-circumstances inquiry requires the court to weigh the highly limited, ambiguous nature of what Officer Reid saw and the presence of several plausible, competing explanations. *See id.* at 389 (Kagan, J., concurring); *see also United States v. Sokolow*, 490 U.S. 1, 10 (1989)

---

[5]  Contrary to the defense's suggestion, however, it would not have been obvious to the pursuing officers that Abass's pants were falling during the chase. *See* Gov't Ex. 402 at 6:01:03–12. Abass's efforts to keep his pants up would have become apparent only during the roughly four-second period when Abass tried to enter the silver sedan and Officer Vanreil grabbed him. *See* Oct. 6 Tr. at 9–11; *see also* Gov't Ex. 302 at 17:58:58–17:59:02.  Accordingly, this is not a case where there was "an apparent, wholly innocent explanation" for "the only particularized fact on which the government is able to rely." *United States v. Johnson*, 365 F. Supp. 3d 89, 104 (D.D.C. 2019).  It is one where there are plausible but not obvious competing innocent explanations.

(directing courts to consider "the degree of suspicion that attaches to particular types of noncriminal acts").

In sum, "although the positioning of [Abass's] arm certainly has some relevance" and partially contributes to reasonable suspicion, *United States v. Johnson*, 365 F. Supp. 3d 89, 104 (D.D.C. 2019), it carries too little weight to alone furnish the "other indicia of wrongdoing" that the Government needs. *Bonner*, 363 F.3d at 217; *cf. Brown*, 925 F.3d at 1157 ("Although flight *may* be suggestive of wrongdoing, the absence of other factors here, when considered alongside a tip that is entitled to little weight, underscores the lack of reasonable suspicion.").

> d.  <u>Coordinated Evasion</u>

The Government points to one final fact, however, that is sufficient to nudge it over the finish line:  The Defendant's attempt to get into the silver sedan, which also fled upon the sight of police.  *See* Gov't Opp'n at 10.

It is well established that coordinated evasion between a Defendant and an associate can support reasonable suspicion.  In *United States v. Edmonds*, the D.C. Circuit held that "the flight of [the defendant's companion] contributed to a reasonable suspicion that criminal activity might be afoot."  240 F.3d at 62.  Similarly, in *United States v. Briggs*, the Tenth Circuit held that "the flight of [the defendant's] companion . . . heightened a reasonable officer's suspicion" given "circumstances . . . suggest[ing] that the two men acted in concert."  720 F.3d 1281, 1290–91 (10th Cir. 2013).

Several facts suggest that the Defendant and the silver sedan were engaged in coordinated evasion.  The parked silver sedan drove off as soon as the two marked police cruisers approached.  Gov't Ex. 401 at 6:00:40–57 (MPD Camera Footage); *see also* Oct. 3 Tr. at 41. Shortly thereafter, the Defendant exited the gray sedan and "made a beeline" for the silver sedan.

Oct. 6 Tr. at 27.  The silver sedan came a complete stop halfway down the block as the Defendant ran toward it.  *See* Gov't Ex. 402 at 6:01:04–09.  The Defendant then opened the silver sedan's front passenger-side door and tried to get in as police tried to stop him.  *See* Gov't Ex. 302 at 17:58:58–17:59:02.

This apparent coordinated evasion is significant because it undermines the innocent explanations for the Defendant's other behavior.  *See Johnson*, 365 F. Supp. 3d at 104 ("[T]he likelihood of innocence diminishes when multiple particularized, suspicious factors are present, even if each factor alone could be 'susceptible of innocent explanation.'" (quoting *Arvizu*, 534 U.S. at 277)).  Although it is possible that the Defendant fled upon seeing police not because he was engaged in wrongdoing, but for some innocent reason, it is less probable that *both* the Defendant *and* his companion simultaneously fled for innocent reasons.  Similarly, although it is possible the Defendant was merely holding up his pants as he ran, his unusual arm position seems less innocent when viewed in conjunction with this additional fact.

In sum, while each fact standing alone falls short of establishing reasonable suspicion, the "totality-of-the-circumstances test 'precludes . . . divide-and-conquer analysis.'"  *Wesby*, 583 U.S. at 62 (quoting *Arvizu*, 534 U.S. at 274).  Taken together, the Defendant's unprovoked, headlong flight upon spotting police; his unusual left-arm position while running; and his coordinated evasion with the fleeing silver sedan narrowly suffice to establish reasonable suspicion to justify the initial stop.

### C.  Probable Cause

"Circumstances arising during the course of a lawful stop may cause reasonable suspicion to ripen into probable cause," allowing officers to make a warrantless arrest.  *United States v. Stubblefield*, 931 F. Supp. 2d 118, 129 (D.D.C. 2013); *see also Wesby*, 583 U.S. at 56.  Probable

cause is more than reasonable suspicion but "less than a preponderance of the evidence." *United States v. Burnett*, 827 F.3d 1108, 1114 (D.C. Cir. 2016). "It 'requires only a probability or substantial chance of criminal activity, not an actual showing of such activity.'" *Wesby*, 583 U.S. at 57 (*Illinois v. Gates*, 462 U.S. 213, 232 (1983)). Once a person has been lawfully arrested, officers may search that person incident to arrest. *United States v. Birden*, 55 F.3d 684 (D.C. Cir. 1995) (per curiam).

Here, "the discovery of the gun in plain view ripened what had been merely reasonable suspicion into the full-scale probable cause necessary for an arrest." *Brown*, 334 F.3d at 1170 (quoting *United States v. Hensley*, 469 U.S. 221, 236 (1985) (Brennan, J., concurring)). Just seconds after Officer Vanreil grabbed the Defendant as he was struggling to get into the silver sedan, Officer Greenberg spotted a gun close to where Vanreil and the Defendant had struggled. Officers had not seen a gun in that area when they drove down the 1300 block of Orren just moments earlier. The timing and the location of the discovery, as well as the Defendant's continued flight from the police by clinging to a moving vehicle that was dragging him in the street, gave rise to a fair probability that the Defendant had unlawfully possessed the gun found in the street. As a result, officers had probable cause to arrest the Defendant. The subsequent search of his person, which resulted in the recovery of pills, was therefore a lawful search incident to arrest.

## IV.    CONCLUSION

For the foregoing reasons, the Defendant's Motion to Suppress is DENIED.

Date: November 10, 2025

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge